**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

NEW YORK STATE THRUWAY AUTHORITY,

                 Plaintiff,

    - v -                        Civ. No. 1:10-CV-154
                                   (LEK/RFT)

LEVEL 3 COMMUNICATIONS, LLC,

                 Defendant.

**APPEARANCES:**                     **OF COUNSEL:**

*Hon. Andrew M. Cuomo*          Henry Collins, Esq.
Attorney General for the State of New York    Ass't. Attorney General
Attorney for New York State Thruway Authority
The Capitol
Albany, New York 12224

*Bond, Schoeneck & King PLLC*       Ryan M. Finn, Esq.
Attorney for New York State Thruway Authority   Colm P. Ryan, Esq.
111 Washington Avenue
Albany, New York 12210-2280

*Dewey & LeBoeuf LLP*            Brian T. Fitzgerald, Esq.
Attorney for Level 3 Communications, LLC    Jeffrey D. Kuhn, Esq.
99 Washington Avenue
Suite 2020, One Commerce Plaza
Albany, New York 12210-2820

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**MEMORANDUM-DECISION and ORDER**

      On October 14, 2009, the New York State Thruway Authority (hereinafter

NYSTA), a public authority, filed a Complaint against Level 3 Communications, LLC

(hereinafter Level 3), in New York State Supreme Court alleging a breach of contract.[1]
Afterwards a Summons and Complaint were served and Level 3 removed this litigation to this Federal District Court. *See generally* Dkt. No. 1, Not. of Removal & Compl.  Presently before this Court is Level 3's Motion to Stay this litigation, resting upon the doctrine of primary jurisdiction, dkt. no. 14, which NYSTA opposes, dkt. nos. 15 & 16.  Level 3 further filed a Reply.  Dkt. No. 17.[2]

## I. BACKGROUND

Fundamentally, there is little, if any, disagreement as to facts relative to this Motion.  In a broader context, this lawsuit concerns the establishment of broadband networks, a fiber optic backbone network, along the New York State Thruway, which spans approximately 570 miles.[3]

A.  Contractual Rights

---

[1]  On March 3, 2010, NYSTA filed an Amended Complaint pleading breach of a contract, a State Finance Law § 18 claim, a separate anticipatory breach of contract, and further a claim seeking a declaratory judgment.  Dkt. No. 8, Am. Compl.

[2]  Level 3's Motion to Stay, Dkt. No. 14, is comprised of the following: 14-1, Memorandum of Law; 14-2, Jeffrey D. Kuhn, Esq., Aff., dated Apr. 30, 2010, with Exs. A-D.

NYSTA's Opposition to the Motion is comprised of the following: Dkt. No. 15, Ryan M. Finn, Esq., Aff., dated May 14, 2010, with Exs. 1-3; and, Dkt. No. 16, Memorandum of Law.

Lastly, Level 3's Reply is yet another Memorandum of Law.  Dkt. No. 17.

[3]  For purposes of this background discussion, the Court generally refers to Jeffrey D. Kuhn's Affidavit and Level 3's Petition to the Federal Communication Commission, dated July 23, 2009, Dkt. No. 14, Ex. A, as supplemented by Ryan M. Finn's Affidavit.

In October 1995, NYSTA entered into an agreement with Adesta Communications, Inc. (hereinafter Adesta)[4] granting Adesta authority to develop, operate, and maintain communications network along the Thruway.  In exchange for this right of way, Adesta agreed to pay NYSTA a share of the user's fee.  Then, in 1999, Adesta entered into two interrelated agreements with Williams Communications, Inc. (hereinafter Williams), pertaining to a new fiber-optic backbone network which would be owned and operated by Williams along the same Thruway corridor.  The first agreement -- entitled "User Agreement for Innerduct" -- covered the portions of the network to be deployed on NYSTA's right-of-way.  To distinguish this agreement from the second, the parties referred to this agreement as the "On-NYSTA User Agreement" (hereinafter On-NYSTA).  The second agreement -- entitled "User Agreement for Innerduct and Dark Fibers, also referred to as "Off-NYSTA User Agreement (hereinafter Off-NYSTA)" -- covered the portion of the network that would not be located on NYSTA's right-of-way.

Under the On-NYSTA agreement, Williams acquired an indefeasible right of use (IRU) covering two vacant innderducts and 48 strands of dark fiber on Adesta's planned communications network along this thoroughfare.  In addition, Adesta agreed

---

[4] At the time of this contract, Adesta was known as MFS Network Technologies, Inc.  After an asset acquisition in 2002, MFS's name was changed to Adesta.

to install fiber-optic cable supplied by Williams. In exchange, Williams was required to pay Adesta for the IRU and an installation fee totaling $31 million. Of that $31 million, NYSTA was entitled to a fee which ranged between $8.25 million and $15 million.   The result of this agreement was a high-capacity network (hereinafter Backbone Network) which covered 520 miles on NYSTA's right-of-way.

Williams believed that without additional interconnection points, it could not properly operate the Backbone Network.  Therefore, Williams planned to acquire 13 sites adjacent to NYSTA's right-of-way for "regeneration" facilities that would be used to regenerate optical signals along the Backbone Network.  Williams concluded that without these "regeneration" facilities, this Network would be unusable.  In order to establish these "regeneration" facilities and to make the proper connections to the Backbone Network, Williams was advised that they would have to obtain separate occupancy permits from NYSTA at an additional cost.  Although Level 3, Williams' successor, now argues that this additional charge was unreasonable and inconsistent with the terms of the On-NYSTA agreement, Williams executed occupancy permits for 17 additional connections.  Each of these additional occupancy permits, which identified the corresponding rent, ranging between $78 per foot per year to $34,000 per foot per year, generated a rider to the On-NYSTA Agreement.[5]

---

[5] These Riders contain other terms and conditions Level 3 finds objectionable.  For example,

(continued...)

In 2002, Williams filed for bankruptcy and later in that year emerged as WilTel Communications Group (WilTel).  In December 2005, Level 3 acquired WilTel and took ownership of Williams's interest in the Backbone Network.  Beginning in 2006, Level 3 began integrating the WilTel network and operations, but, within a year, disputed the right-of-way payments as unreasonable and discriminatory and, thus, in contravention of federal law.  Level 3 stopped making payments to NYSTA yet continued to use the Network.  Though there were attempts to settle the matter, all efforts have thus far failed.

B. Petition before Federal Communication Commission (FCC)

By a letter, dated July 7, 2009, NYSTA advised Level 3 that $2,070,266 was due and owing and threatened litigation.  Dkt. No. 8, Am. Compl. at ¶¶ 18-20.  Within a matter of weeks, on July 23, 2009, Level 3 filed a Petition For a Declaratory Ruling with the FCC that the right-of-way rents imposed by the NYSTA are preempted under 47 U.S.C. § 253.[6]  Dkt. No. 14, Ex. A. Pet.  The crux of Level 3's Petition is that the

_____

[5](...continued)
each Rider contains a release of claims against NYSTA.  *See* Kuhn's Aff. at ¶ 15; Ex. A, Pet. to FCC. Level 3 also complains that Williams was left with no option to object to NYSTA demands for compensation. Because the Backbone Network was essentially completed, neither litigation of the compensation issue nor walking away from the project were economically feasible.  *See generally* Pet.  The gist of Level 3's argument is that its predecessor, Williams, entered into an unconscionable agreement under duress.

[6]  The Telecommunications Act of 1996 (TCA).  The Court relies upon a recent Northern
(continued...)

Riders are unreasonable, discriminatory, divorced from prevailing market rates, and

should be preempted under § 253 which states, in part:

> No State or local statute or regulation, or other State or local legal
> requirement, may prohibit or have the effect of prohibiting the ability of
> any entity to provide any interstate or intrastate telecommunications
> service.

*Id*. at § 253(a).

\*\*\*\*

If, after notice and an opportunity for public comment, the Commission

---

[6](...continued)
District case which succinctly overviews the statute and its implications:

> Congress passed the TCA in 1996 in order "to end the monopolies in local telephone
> services and to benefit consumers by fostering competition between telephone
> companies in cities throughout the United States[.]" *AT & T Communications of the
> Southwest, Inc. v. City of Dallas,* 8 F. Supp. 2d 582, 585 (N.D.Tex.1998). In
> furtherance of this goal, Congress implemented restrictions on the authority of local
> governments to limit the ability of telecommunications companies to do business in
> local markets. *See AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366 (1999). Section
> 253 of the TCA "embodies the balance between Congress' 'new free market vision'
> and its recognition of the 'continuing need for state and local governments to
> regulate telecommunications providers on grounds such as consumer protection and
> public safety.' " *TCG New York, Inc. v. City of White Plains,* 125 F. Supp. 2d 81, 87
> (2000), *aff'd in part, rev'd in part on other grounds,* 305 F.3d 67 (2d Cir. 2002)
> (quotation omitted). The plain terms of § 253 preempt many local laws; however,
> notwithstanding this general prohibition, local governments retain some regulatory
> authority. Under § 253, all state and local regulations that prohibit or have the effect
> of prohibiting any company's ability to provide telecommunications services are
> preempted *unless* such regulations fall within either of the statute's two "safe harbor"
> provisions, §§ 253(b) and (c). *See City of Auburn,* 260 F.3d at 1175.

> Thus, as the Second Circuit has clarified, the appropriate methodology for resolving
> the present claims is to first determine whether the Town's regulations fall within the
> proscription of § 253(a) and then, if they do, to determine whether certain provisions
> are nevertheless permissible under section § 253(c). *See TCG New York, Inc. v. City
> of White Plains,* 305 F.3d 67, 77 (2d Cir. 2002).

*TC Sys., Inc. v. Town of Colonie, New York*, 263 F. Supp. 2d 471, 480-81 (N.D.N.Y. 2003).

determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

*Id*. at § 253(d).

Essentially, pursuant to these subsections, either the FCC or a court may preempt enforcement of any state or local statute, regulation, or "legal requirement" that prohibits or has the effect of prohibiting the ability of an entity to provide either intrastate or interstate communications services.  In this respect, Level 3 charges that the rents associated with the Riders constitute such a "legal requirement" that has interdicted its ability to provide telecommunications services to various rural and smaller communities in Upstate New York.

On October 15, 2009, NYSTA filed its opposition to Level 3's Petition, relying upon the propositions that: (1) this is a contract dispute that should be decided by a court and not the FCC; (2) the FCC does not have jurisdiction because this matter does not fall within § 253(a); (3) even if jurisdiction is found, Level 3 cannot meet its burden under § 253(a); and (4) the rent is competitively neutral, nondiscriminatory, and reasonable, thus excepted from preemption by § 253(c).  *See* Dkt. No. 14, Ex. B, Def.'s Opp'n to Pet.  Section 253(c) is commonly known as a safe harbor provision. It states that

[n]othing in this section affects the authority of a State or local

government to manage the public rights-of-way or to require fair and
reasonable compensation from telecommunications providers, on a
competitively neutral and nondiscriminatory basis, for use of public
rights-of-way on a nondiscriminatory basis, if the compensation required
is publicly disclosed by such government.

*Id*. at § 253(c).[7]

On August 25, 2009, the FCC issued a public notice inviting comments on
Level 3's Petition, which comment period was extended to November 5, 2009. More
than a dozen parties have submitted comments.

On October 14, 2009, NYSTA filed its Complaint with New York Supreme
Court in Albany, New York. Service of a Summons and Complaint upon Level 3 was
completed on January 13, 2010. On February 9, 2010, Level 3 removed NYSTA's
state action to the Northern District of New York. As previously noted, NYSTA
amended its Complaint, pleading several causes of action and seeking a declaratory
judgment that the Riders in question do comply with federal law and are valid and
enforceable. *See supra* note 1; Dkt. No. 8, Am. Compl.

## II. PRIMARY JURISDICTION PRINCIPLES

---

[7] Depending upon the circumstances and a party's perspective, § 253(b) can be viewed as
either a basis for preemption or as a safe harbor:

Nothing in this section shall affect the ability of a State to impose, on a competitively
neutral basis and consistent with section 254 of this title, requirements necessary to
preserve and advance universal service, protect the public safety and welfare, ensure
the continued quality of telecommunications services, and safeguard the rights of consumers.

Primary jurisdiction is a richly developed, prudential doctrine with the chief mission of "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties . . . [and] to ensure that they do not work at cross-purposes." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (internal quotation marks and citations omitted).  In order for this mission to be fulfilled, judicial forbearance in managing the litigation is essential.  However, "judicial forbearance hinges . . . on the authority Congress delegated to the agency." *Id*.  This discretionary doctrine applies when a claim

> is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Mathirampuzha v. Potter,* 548 F.3d 70, 83-84 (2d Cir. 2008) (quoting *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 63-64 (1956) & *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) ("Referral of the issue to the administrative agency does not deprive the court of jurisdiction[.]").

The driving precepts of the primary jurisdiction doctrine are consistency and uniformity in the regulation of an area entrusted to a particular federal agency, *Ellis v. Tribune Television, Co.*, 443 F.3d at 82 (citations omitted), and the "resolution of technical questions of facts through the agency's specialized expertise, prior to the judicial consideration of the legal claims," *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir. 2002) (quoting *Golden Hill Paugussett Tribe v.*

*Weicker*, 39 F.3d 51, 59 (2d Cir. 1994), *cert denied*, 538 U.S. 923 (2003)).  An

agency's specialized expertise may come into play as to

> whether a case raises "issues of fact not **within the conventional**
> **experience of judges," but within the purview of an agency's**
> **responsibilities**; whether the "limited functions of review by the
> judiciary are more rationally exercised, by preliminary resort" to an
> agency "better equipped than courts" to resolve an issue in the first
> instance; or, in a word, whether preliminary reference of issues to the
> agency will promote that proper working relationship between court and
> agency that the primary jurisdiction doctrine seeks to facilitate.

*Ellis v. Tribune Television Co.*, 443 F.3d at 82 (citations omitted) (emphasis added).

Since this is a discretionary doctrine, no fixed formula exists and the courts

have generally considered four factors when deciding whether to defer to an agency:

> (1) whether the question at issue is within the conventional experience
> of judges or whether it involves technical or policy considerations within
> the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's
> discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made[.]"

*Schiller v. Tower Semiconductor Ltd.,* 449 F.3d 286, 295 (2d Cir. 2006) (citing *Ellis*
*v. Tribune Television Co.,* 443 F.3d at 82-83); *Fed. Trade Comm'n v. Verity Int'l.,*
*Ltd.*, 443 F.3d 48, 60 (2d Cir. 2006).

Further, "[t]he court must also balance the advantages of applying the doctrine against

the potential costs resulting from complications and delay in the administrative

proceedings."  *Nat'l Commc'ns Ass'n, Inc. v. A Tel. & Tel. Co.,* 46 F.3d 220, 222 (2d

Cir.1995).

*-10-*

The primary jurisdiction doctrine is not as sweeping as it may project, but rather has a "relatively narrow scope." *Goya Food, Inc. v. Tropicana Prods. Inc.*, 846 F.2d 848, 851 (2d Cir. 1988). The courts "ordinarily do not defer when the issue involved is purely a legal question, one not involving agency expertise or experience," *Gen. Elec. Co. v. MY Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir. 1987) (citations omitted), nor do they have to find a need to "secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit," *Global Crossing Bandwith, Inc., v. OLS, Inc.*, 2009 WL 763483, at *7 (citations omitted). Therefore, the doctrine should be "applied flexibly[,] . . . should not be lightly invoked . . . and that cases in which its application is warranted tend to be the exception and not the norm." *Global Crossing Bandwith, Inc., v. OLS, Inc*., 2009 WL 763483, at *2 (W.D.N.Y. Mar. 19, 2009) (citations omitted). Essentially, "the doctrine should not be applied mechanically or according to some rigid formulas." *Id*. at *3 (citing *Ellis v. Tribune Television Co.*, 443 F.3d at 82). Yet, we are mindful that at times there may be a need to protect the primary authority of an agency when it is determining its own jurisdiction: "While the [agency's] decision is not the last word, it must assuredly be the first." *Fed. Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 647 (1972) (alteration in the original) (internal quotation marks and citations omitted). Hence, the analysis as to whether the primary jurisdiction doctrine should be invoked

must be done on a case-by-case basis.  The courts "ordinarily do not defer when the issue involved is purely a legal question, one not involving agency expertise or experience,"  *Gen. Elec. Co. v. MY Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir. 1987) (citations omitted), nor do they have to find a need to "secure advise from agencies every time a court is presented with an issue conceivably within the agency's ambit," *Global Crossing Bandwith, Inc., v. OLS, Inc.*, 2009 WL 763483, at *7 (citations omitted).

### III. DISCUSSION[8]

Before the Court engages in an analysis of the four factors, we provide a foreword on the Telecommunications Act of 1996 (TCA) and its relevance to litigation. *See supra* n.6. If a local law, regulation, or legal requirement "materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment," the governmental action is preempted. *TCG New York, Inc. v. City of White Plains*, 305 F.3d at 76 (quoting *Cal.*

---

[8] In performing this analysis, at this particular stage of the litigation, the Court must tread gingerly so as to not convey to the parties that any portion of this Memorandum-Decision and Order (MDO) is resolving any material aspects or the merits of this litigation.  In arguing the applicability of the four factors, the parties drilled down into the actual merits of the litigation. They vigorously debated the virtues of their overall positions rather than focusing narrowly and keenly as to whether a stay of this litigation is in order primarily because the primary jurisdiction of the matter lies with the FCC.  Now the Court understands the difficulties confronting the parties as they  perfected their arguments and recognizes their need to fully state their position, nonetheless, it is critical not to confuse the reach of this MDO as extending beyond the confines of this Motion and that any findings of facts herein are solely limited to the issue of a stay.

*Payphone Ass'n*, 12 F.C.C.R. 14191, 1997 WL 400726, at *31 (1997)).

A local statute is not implicated in our case. Rather, Level 3's basis for seeking a stay and possibly preemption under §§ 253(a) and (d) falls within the penumbra of "local legal requirement." *See supra* Part I.B. More specifically, Level 3's contention that NYSTA's "legal requirement" effectively prohibits telecommunication services is actually found in the text of § 253(c) insofar as the questioned rent imposed by NYSTA is neither "fair and reasonable compensation"[9] nor "competitively neutral and nondiscriminatory." Hence, for our purposes in reaching the nerve center of Level 3's Motion, §§ 253(a) and (c) must be read together in order to appreciate the nature of the prohibition and the provocation for preemption, notwithstanding that generally speaking § 253(c) is supposed to be a safe harbor from such a consequence. With that being said, the imposition of a "prohibitively high level of compensation" could conceivably have the effect of prohibiting the ability of an entity to provide telecommunications services. *Qwest Commc'n Corp. v. Maryland-National Capital Park & Planning Comm'n*, 598 F. Supp. 2d 704, 706 (D. Md. 2009). Given all of this, whether the matter is before this Court or the FCC, the roadmap in addressing preemption under § 253 requires Level 3 to meet its burden under § 253(a) and

---

[9] The Second Circuit observed that 47 U.S.C. § 253(c) does not define the scope of "fair" and "reasonable" compensation," and relied upon their ordinarily understood meanings. *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 77 (2d Cir. 2002).

demonstrate that it has been effectively prohibited by the prohibitively high rent from providing communications services, and upon doing so, the burden would shift to NYSTA to prove that § 253(c)'s "safe harbor" is applicable. *TC Sys., Inc. v. Town of Colonie, New York*, 263 F. Supp. 2d at 481 (citing *TCG New York, Inc. v. City of White Plains*, 305 F.3d at 77.)  The Court now turns to the four factors to ascertain whether this litigation should be stayed and whether the issue of the Riders' enforceability should be deferred to the FCC for a ruling.

A.  *Factor 1* - Whether Determining the Alleged Prohibitive Nature of the Riders Involves Technical or Policy Considerations within the FCC's Particular Field of Expertise.

Level 3 contends that the FCC is uniquely qualified to determine if the Riders effectively prevent it from providing telecommunications services and, if so, thus subject them to preemption under Section 253.  According to Level 3, "[t]his inquiry necessarily involves a factual investigation . . . into technical or policy considerations within the FCC's particular field of expertise. . . [and] is not something within the conventional expertise of judges[.]"  Dkt. No. 14-2, Def.'s Mem. of Law at pp. 5-6 (internal quotations marks and citations omitted).  Moreover, Level 3 asserts that contractual claims of this nature, embossed with technical and policy considerations, would be best resolved or aided by an agency review.  The question for Level 3 is not that Level 3 ceased payment of rents but whether the Riders are preempted by § 253

and are therefore unenforceable, clearly driving this matter into the "FCC's bailiwick." *Id*. at p. 7.  In this respect, Level 3 argues that it would be appropriate for the Court to defer to the FCC in order to use its institutional expertise and its administrative procedures to resolve this issue.  *Id*. at p. 6.

On the other hand, NYSTA disputes that primary jurisdiction is present or even necessary in this case and strongly contends that this litigation is a contractual dispute, a classic common law action which is aptly handled by the courts and not a federal agency. *See generally* Dkt. No. 16, Pl.'s Mem. of Law.  NYSTA raises several points to support its position that this matter should remain with this Court:  First, Congress did not delegate to the FCC the particular responsibility in matters of this ilk nor is it peculiarly suited to settle private contractual disputes or even to interpret or apply terms such as reasonable, fair, neutral, and discriminatory.  *Id*. at pp. 11-12.  Second, this matter, which in NYSTA's view is an arms-length negotiated contract, does not involve any technicality nor entail policy considerations.  And, third, courts throughout the country have displayed the indispensable competence and expertise to resolve contractual disputes of this nature.  *Id*. at pp. 6, 8 & 12.

As to this first factor, the Court agrees with NYSTA that FCC does not have special competence in this arena and this matter does fall squarely within the conventional experience of judges.  There is nothing presented that supports the

notion that this agency is better equipped than the courts to resolve this issue in the first instance.  And, the weight of the case law strongly urges this finding.

Contract disputes are legal questions within the conventional competence of the courts and thus the doctrine of primary jurisdiction does not normally apply.  *New York State Elec. and Gas Corp. v. New York Independent Sys. Operator, Inc.*, 168 F. Supp. 2d 23, 27 (N.D.N.Y. 2001).[10]  The record before this Court does not present any issues "involving intricate interpretations or applications" of the terms reasonable, fair, neutral, and discriminatory that would require the FCC's expertise and primary jurisdiction should not be extended to legal questions which are already deemed to be within a court's prudential province.  *Nat'l Commc'n Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d at 223.  The Court does not want to promote, however, the notion that the FCC does not have any expertise in addressing this issue.  *TCG New York, Inc. v. City of White Plains*, 305 F.3d at 75 (noting that the FCC has the ability to interpret § 253(c)); *IPCO Safety Corp. v. WorldCom, Inc.*, 944 F. Supp. 352, 556 (D.N.J. 1996) (finding that with regard to reasonable tariffs, the "FCC is vested with the duty of

---

[10] The Court recognizes that the District Judge in this cited case found primary jurisdiction with the FCC and stayed the action.  But those facts are distinguishable from the contractual matter here.  The Honorable Howard Munson, former District Court Judge, was confronted with a  matter of determining the reasonableness of tariffs.  *New York State Elec and Gas Corp. v. New York Independent Sys. Operator, Inc.*, 168 F. Supp. 2d 23, 25-26 (N.D.N.Y. 2001).  Judge Munson noted that tariffs are heavily laden with technical, complex, policy questions and considerations and "where mutual jurisdiction exists, referral to an agency is appropriate[.]"  *Id.*

prescribing just and reasonable charges, practice, classifications, and regulations regarding such services") (internal quotations and citations omitted).  But the doctrine of primary jurisdiction does not require that all claims that may fall within an agency's purview must be decided by the agency.  *Tassy v. Brunswick Hosp. Center, Inc*., 296 F.3d 65, 73 (2d Cir. 2002).  "Simply because a matter falls within the FCC's jurisdiction does not necessarily mean that the primary jurisdiction doctrine is applicable, however.  As stated, the doctrine should not be applied mechanically or according to some rigid formula."  *Global Crossing Bandwith, Inc. v. OLS, Inc.*, 2009 WL 763483, at * 3 (citing *Ellis v. Tribune Television Co.*, 443 F.3d at 82 for the proposition that "primary jurisdiction analysis is on a case-by-case basis").  Ostensibly then, there is no need to secure agency advice each and every time.  *Id*. at *7.

A very recent case from the Western District of New York is highly instructive for our discussion.  The plaintiff, Global Crossing Bandwidth, brought an action arising out of a breach of a telecommunications contract.  *Global Crossing Bandwith v. OLS, Inc*., 2009 WL 763483.  The Honorable David G. Larimer, United States District Judge, denied OLS's motion for summary judgment and granted Global Crossing's cross-motion for summary judgment.  Subsequently, OLS filed a motion seeking a stay of the proceedings relying upon the primary jurisdiction doctrine and arguing that the matter should be decided by the FCC.  In a thorough and carefully

-17-

crafted analysis of the doctrine of primary jurisdiction, Judge Larimer applied the four

critical factors and denied the motion; none of the four factors were found in OLS's

favor.   What is relevant in terms of our findings is that Judge Larimer, though

conceding there were some technical issues, apprehended that none of those issues

were "arcane, complex or esoteric [so] that they would best be left to the agency to

decide in the first instance."  *Id*. at \*5 (citing *Business Edge Group, Inc. v. Champion*

*Mortg. Co.*, 519 F.3d 150, 154 (3d Cir. 2008)).[11]

This Court also finds highly persuasive the Second Circuit's tutelage on

primary jurisdiction and the reasonableness of rates as found in *Gen. Elec. Co. v. MV*

*Nedlloyd*, 817 F.2d 1022 (2d Cir. 1987).  In that case, the shipper of goods that were

damaged challenged the carrier's *ad valorem* rate.  Defendant Nedlloyd argued that

the challenges essentially invoked an attack on its reasonableness, and under the

doctrine of primary jurisdiction, the Federal Maritime Commission (FMC) was the

proper body to pass on that complaint first.  Dispensing with the doctrine, and finding

all of the four factors against Nedlloyd, the Second Circuit reasoned that the distinct

legal issue of "whether Nedlloyd's rate is set so unreasonably high that courts should

---

[11]  In the cited case, the Third Circuit ruled that the matter presented "technical questions of facts that are within the expertise of the FCC[,]" yet, found it was "more appropriate to remand to the District Court for further proceedings than to transfer it to the agency because we find that the meaning of the regulation can be determined from its text."  *Business Edge Group, Inc. v. Champion Mortg. Co.*, 519 F.3d 150, 154 (3d Cir. 2008).

refuse to give effect to its contractual limitation of liability" truly involved an application of common law principles, which is "more competently decided in a judicial forum." *Id*. at 1027-28.

More specifically, Level 3's underlying argument against these Riders is that its predecessor, Williams, and now it, had the sword of Damocles hanging over its head and had no choice but to relent to NYSTA's duress and agree to higher rents or else forego its multi-million dollar investment in the Backbone Network.  This argument has the trademarks of a common law complaint of an "adhesion contract." An adhesion contract, also known as an unconscionable contract, is defined as one "which is so grossly unreasonable as to be unenforceable because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *King v. Fox*, 7 N.Y.3d 181, 191 (2006) (citing *Gilliam v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1 (1988)).  Here, any determination of the issues will require an examination of the contract formation process and the alleged lack of meaningful choice in light of the mores and business practices at the time.  *Lawrence v. Miller*, 48 A.D.3d 1 (N.Y. App. Div. 1st Dep't 2007).  An adhesion contract is not a new concept of which courts lack familiarity. Instead, courts have grappled with these sorts of claims for eons.  So, it would seem that a court, who is determining the fairness and reasonableness of a rental fee by

scrutinizing the contractual process and the alleged lack of choice under current business practice, is actually better equipped and has more specialized competence to decide the issue than does an agency.  Even the FCC has recognized that oftentimes private contractual matters are most appropriately considered by the courts.  *In re App. of Cope Comm'cn, Inc*., 13 F.C.C.R. 14564, 14567 (July 31, 1998).

There is a litany of other reported cases in which the courts - not an agency - determined the contract and fee issues related to the telecommunications industry.  *See e.g., Global Network Commc'ns, Inc. v. City of New York*, 562 F.3d 145 (2d Cir. 2009) (the court, and not an agency, found that the ability to pay a reasonable fee fell within § 253(c)); *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996) (finding the application of the "primary jurisdiction doctrine inappropriate because the issues of contract interpretation here are neither beyond the conventional expertise of judges nor with the special competence of the [agency]"); *In re DBSD North America., Inc.*, 427 B.R. 245 (S.D.N.Y. Mar 30, 2010) (finding that the primary issue of joint and several liability was within the conventional expertise of the court and not principally within the FCC's expertise); *Omnipoint Commc'ns, Inc. v. Port Auth. of New York and New Jersey*, 1999 WL 494120 (S.D.N.Y. July 13, 1999) (in denying a preliminary injunction, it was the court, and not an agency, who was called upon to address § 253 and what constitutes a reasonable and fair fee).

Even more analogous to our situation is Level 3's litigation in the 8th Circuit. In the case of *Level 3 Commc'ns, L.L.C. v. City of St. Louis, Mo.*, 477 F.3d 528 (8th Cir. 2007), Level 3 sued the City of St. Louis seeking a declaratory judgment that the terms, restrictions, obligations, and fees violated the Telecommunications Act. Under the agreement, St. Louis charged an annual licensing fee which Level 3 refused to continue paying in 2003. Since Level 3 did not invoke the primary jurisdiction doctrine, it was not an issue in that case. What is most salient though is that the courts, both the district court and the Eighth Circuit addressed the relationship between §§ 253(a) and (c). And, the Circuit Court found, after a thorough review of the record, insufficient evidence from Level 3 of any actual or effective prohibition of a telecommunications service, including the matter of the fees.

Noteworthy again is that the courts and not an agency handle these types of issues that are currently before this Court. Within the context of a common law contract dispute, the concept of reasonable and fair compensation can be readily addressed by presenting to the Court sufficient market analysis, the same proof that may be presented to an administrative agency, to demonstrate that the rental fees are onerous, unreasonable, and discriminatory. *See Omnipoint*, 1999 WL 494120, at *8. This case does not present abstractions outside the normal ken of judges that would ideally require the FCC's input. In this respect, factor one clearly disfavors primary

jurisdiction.

> B. *Factor 2* - Whether a Decision on Subsections 253(a) and (c) is Particularly within the FCC's Discretion.

Frankly, in light of the above discussion, Factor 2 weighs heavily against deferral of this matter to the FCC under the doctrine of primary jurisdiction.  As the Court has thoroughly discussed above, the record does not indicate that a decision regarding these subsections of Section 253, especially § 253(c), are particularly within the FCC's independent sphere.  The many cases cited above reflect the contrary. Section 253 provides concurrent jurisdiction, not selective or exclusive jurisdiction. *TCG New York, Inc. v. City of White Plains*, 305 F.3d at 75.[12]  To reiterate, the FCC is not in possession of any specialized competence and expertise nor is this the kind of issue peculiarly suited for initial determination by it on the matter of reasonable and fair compensation.  *Cf. Weinberger v. Bentex Pharm., Inc.*, 412 U.S. 645 (1973). Worthy of reiteration, "primary jurisdiction does not apply to questions within the conventional competence of the courts."  *New York State Elec. and Gas Corp. v. New York Indep. Sys. Operator, Inc.*, 168 F. Supp. 2d at 26 (quoting *Nat'l Commc'n Ass'n, Inc. v. Am. Tel. & Tel., Co.*, 46 F.3d at 223); *see also  Fulton Cogeneration Assocs.*

---

[12]   In noting that § 253(c) establishes concurrent jurisdiction between the Court and the agency, the Court does not find that the FCC lacks discretionary authority to decide the issues in the case.  Clearly they can.  But that fact does not affect our findings that the deferral to the FCC is not required.

*v. Niagara Mohawk*, 84 F.3d 91, 97 (2d Cir. 1996).  And, courts should not succumb to rigid and fixed formulas in determining primary jurisdiction.  *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d at 295 (citing *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)). Under our analysis, no primary authority was granted to the FCC to determine these very issues and the Court is neither mandated nor obliged to refer this litigation to the FCC for adjudication.[13]  Hence, the Court finds that this factor does not serve the doctrine of primary jurisdiction well in this case.

### C.  *Factor 3* - Whether There Is A Substantial Danger of Inconsistent Rulings If This Matter is not Stayed Until Resolution By The FCC

This Court does not envision a substantial danger of inconsistent rulings by the Court and the FCC.  There appears to be minimal risk that each tribunal will issue a decision that will converge simultaneously.  If both the agency and the Court were on a collision course in rendering relevant decisions on this case, the Court could very easily revisit the issue of a stay then.  There is no cogent reason to await the FCC's decision regarding if it has jurisdiction, which decision has been longtime coming, nor to wait longer, should it conclude it has jurisdiction, in order for it to render findings on the Petition.  Such a delay would surely derail the benefit of discovery in this litigation and the expedited disposition of the case.  Courts should resist the

---

[13]  The issue of whether there should be deferral to the FCC to determine whether it has, in fact, jurisdiction is discussed in greater detail in Part II.D, Factor 4.

*-23-*

temptation of passing the issue off to another entity for the sake of judicial economy and should hold fast to its "unflagging obligation . . . to exercise the jurisdiction given [it]." *Tassy v. Brunswick Hosp. Center, Inc.*, 296 F.3d at 73.   No matter the development of the record, the issue of a breach of contract will ultimately be decided by this Court.

Moreover, whether the FCC, after determining that it has jurisdiction, decides the matter of whether the rents actually prohibit or effectively prohibit a telecommunications entity from providing services is of no critical moment in this case.   Presuming for a moment that FCC renders a ruling as to whether the rent is unfair and unreasonable, or discriminatory, that ruling may not be as dispositive as Level 3 may think.   As the Second Circuit has made crystal clear, an FCC ruling is entitled to "some deference" but is not controlling.   *TCG New York, Inc. v. City of White Plains*, 305 F.3d at 76.   Some deference does not rise to the level of preclusive effect, but may be persuasive in a subsequent proceeding.   Say for example, the rental rates set forth in the Riders are found by the FCC, should it decide the issue first, to be unfair and unreasonable, this does not necessarily mean that there would be a complete preclusive effect of the claim that Level 3 may have breached the contract by failing to pay any rent for the past three years.   At best, it is conceivable that a prior ruling on some of the facts by an administrative agency may rise to the level of

collateral estoppel, but the Court seriously doubts that such a determination would have *res judicata* effect on a pending breach of contract cause of action.  *Univ. of Tennessee v. Elliot*, 478 U.S. 788, 798 (1986) (holding that *United States v. Utah Constr. & Min. Co.*, 384 U.S. 394 (1996) "teaches that giving preclusive effect to administrative factfinding serves the value underlying the preclusive effect of collateral estoppel").[14]  In fact, there is no petition, nor could there be, before the FCC to determine the breach of contract claim.  A breach of contract claim rests exclusively within the ambit of the courts even if some components of the claim or defenses may be decided by another tribunal.  This factor does not engender any greater support for a stay and deferral of the litigation.

D. *Factor 4 -* Level 3's Petition Before the FCC

The linchpin of most of Level 3's arguments for a stay pursuant to primary

---

[14]  Relying upon *United States v. Utah Constr. & Min. Co.*, 384 U.S. 394 (1996) Level 3 argues that a ruling by the FCC would have *res judicata* consequences for this litigation, and for that very reason and since there is a pending Petition before the agency, the Court should stay all proceedings here.  Reliance upon this Supreme Court decision is misplaced inasmuch as the *sine qua non* of the case were the very terms of the contract.  The parties had entered into a typical government contract with contract adjustment provisions which had a dispute clause in article 15 that stated all disputes concerning questions of fact arising under the contract shall be decided by the government's contracting officer subject to written appeal to the head of the department or committee.  The gist of *Utah* is that the power of the administrative tribunal to make final and conclusive findings on factual issues *rested upon the contract* and not on the complication of concurrent jurisdiction.  Further, the *Utah* Court found that the dispute clause did not cover all disputes relating to the contract, *id.* at 418, and found that the ruling the Court reached is "harmonious with the general principles of collateral estoppel," *id.* at 421.  Therefore, the Supreme Court concluded to give finality to "the factual findings properly made by the Board."

*-25-*

jurisdiction is the fact that it initiated a Petition with the FCC on July 23, 2009, three months prior to the commencement of this lawsuit on October 14, 2009.  Level 3 clings to the notion that just "[b]ecause the FCC action was initiated before this proceeding, the fourth factor weighs in favor of staying this action," essentially trumping NYSTA's subsequent overture to this judicial forum.  Dkt. No. 14-2, Def.'s Mem. of Law at p. 10.  Level 3 erroneously presumes that "first-in-right" filings automatically determine this factor.  But the calculated race to a purportedly favorable forum does not necessarily translate into an auspicious view of these even for it.

In 2006, within a year of acquiring Williams, Level 3 discontinued rent payments while at the same time still using the Backbone Network.  The alleged failure to pay rent continued for three years and it appears that Level 3 was satisfied with the *status quo*.  Although Level 3 complained in 2006 that the Riders' rents were excessive, it made no effort to present its allegations to any forum until it received a letter, dated July 7, 2009,  from NYSTA, which bascially stated that, unless it was paid $2,000,000 for the rent due and owing, it would commence a lawsuit.  Presumably, NYSTA's Letter was the impetus for Level 3 to eventually file a Petition with the FCC.

The Court is persuaded that the timeliness of invoking the primary jurisdiction doctrine is an element that a court may consider in weighing prior applications.

Although our facts are not analogous to those precedents where the defendants raised the doctrine at the tail end of the litigation, *see Global Crossing Bandwidth*, 2009 WL 763483 (raised after a summary judgment decision had been rendered) (citations omitted), where it appears that the invoking party may have strategically waited until an opportunistic moment arose to seek redress, in an urgent haste to gain some conceived tactical advantage on the matter, the Court should not be so inclined to find this factor for the moving party. Certainly, Level 3 could have registered a petition with FCC much earlier which would have surely tilted the counterweight of deferral in its direction.

The Court returns to our conclusion on the first factor, which, in our view, is more definitive on whether a stay and referral is in order. Since, primary jurisdiction is a discretionary doctrine, it should not be applied mechanically. *TCG New York*, 305 F.3d at 75 (noting that the doctrine of primary jurisdiction has a "relatively narrow scope"). To repeat, the talisman in this calculus is whether there are technical questions uniquely within the expertise and experience of the FCC, which we conclude there are not. And, if there were, a FCC decision would not completely resolve the issue before this Court as to whether NYSTA will succeed on its common law action of breach of a contract. There will be contractual claims and defenses raised before this Court that will not be addressed by the FCC, even if the deferral is

granted. For the reasons stated above, the Court is not swayed by Level 3's argument as to this factor.

Lastly, it is suggested that the Court should "also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Ellis v. Tribune Television Co.*, 443 F.3d at 83(quoting *Nat'l Commc'n Ass'n Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d at 223). In this regard, FCC's delay in resolving its own jurisdiction issue is disquieting. The Court has not ignored the principle that if an agency is deciding jurisdiction, courts are obliged to defer to that agency for the initial determination of its jurisdiction: "While the [agency's] decision is not the last word, it must assuredly be the first." *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 647 (1972). However, the valid litigation already in this Court should not be held hostage to an administrative process that is not proceeding with all deliberate speed, especially when there is a public interest in prompt adjudication of a plaintiff's claims. *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 60 (2d Cir. 1994) (noting that issues were not proceeding on a "fast-track" before the agency). Level 3's Petition was filed on July 23, 2009. More than a dozen amicus briefs have been filed on the issue of jurisdiction. More than a year has elapsed and the FCC has not opined on it own jurisdiction.

Since the Court has found that there are no technical questions of fact uniquely within the FCC's expertise, we take considerable heed of the Second Circuit's dicta that "by no means [is] primary jurisdiction mandatory whenever the jurisdictions of a court and agency overlap." *Ellis v. Tribune Television Co.*, 443 F.3d at 91. All indications lead us to conclude that there are no advantages to applying the doctrine when balanced against the potential costs from any complication and delay in the administrative proceeding. There is no guarantee that an FCC ruling would significantly simplify or shorten this litigation. No matter how the FCC rules, discovery will have to be pursued in this litigation. The Court ventures to state that discovery in this litigation may actually benefit any discussion before the FCC. As we noted before, if the factors indicate otherwise at some later point, the doctrine of primary jurisdiction can be raised again.

## IV. CONCLUSION

For all of the reasons stated above, Level 3's Motion for a Stay, Dkt. No. 14, is **DENIED**.

**IT IS SO ORDERED**.

Albany, New York
August 11, 2010

_____
RANDOLPH F. TREECE
United States Magistrate Judge