UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE THRUWAY
AUTHORITY,

                              Plaintiff,

        -against-                                            1:10-cv-0154 (LEK/RFT)

LEVEL 3 COMMUNICATIONS, LLC,

                              Defendant.
_____

## DECISION and ORDER

## I.        INTRODUCTION

        Plaintiff New York State Thruway Authority ("Plaintiff" or "NYSTA") commenced the

instant action against Defendant Level 3 Communications, LLC ("Defendant"), seeking to recover for a

breach of contract concerning the installation of a fiber optic network along the New York State

Thruway right-of-way.  Presently before the Court is Plaintiff's Motion for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. No. 21 ("Motion").  Defendant

opposes the Motion.  Dkt. No. 22 ("Opposition").  For the reasons set forth below, Plaintiff's Motion is

denied in part and granted in part.

## II.       BACKGROUND

        In 1995, Plaintiff awarded Adesta LLC ("Adesta")[1] a contract to construct, maintain, and

manage a 550-mile fiber optic network ("the Network") along the New York State Thruway.

Plaintiff's Statement of Material Facts (Dkt. No. 21-10) ("PSMF") ¶ 1.  Upon completion of the

Network, Adesta entered into user agreements with various telecommunications providers that allowed

---

        [1] The Agreement identifies Adesta by its former name, MFS Network Technologies,
Inc.  See Tim Elbert Decl. Ex. A (Dkt. No. 22-3) ("Agreement").

the providers to use all or a portion of the Network.  Id. ¶¶ 2-3.  The telecommunications providers paid Adesta a fee for twenty years to use the Network and an annual fee to maintain the conduits, fiber optic cable, and regeneration facilities.  Id. ¶ 4.

In 1999, Williams Communications, Inc. ("Williams"), Defendant's predecessor in interest, became one of the eight telecommunications providers that negotiated a user agreement with Adesta. Id. ¶ 5.  Adesta and Williams executed a user agreement ("the Agreement"), pursuant to which Williams contracted to use the Network for the fee specified in the Agreement.  Id. ¶ 6.  Thereafter, Williams sought to obtain additional access points to the Network, but this required approvals from NYSTA.[2]  Id. ¶ 8.  Between 2000 and 2001, NYSTA and Williams entered into a series of seventeen Riders to Occupancy Permit Applications (the "Riders") that set forth the terms and conditions of Williams' additional fiber access connections to the Network at specified locations.[3]  Id. ¶ 10. Williams agreed to pay, and did pay, an annual per fiber fee for additional access points for the Network and an annual set fee to access additional regeneration facilities.  Id. ¶¶ 16-17.

In April 2002, Williams filed for protection under Chapter 11 of the Bankruptcy Code. PSMF ¶ 12.  In October 2002, Williams emerged from bankruptcy as WilTel Communications Group ("WilTel").  Id. ¶ 13.  In December 2005, Defendant acquired WilTel and took ownership of Williams'

---

[2] NYSTA contends that no other telecommunications providers sought to expand the network. PSMF ¶ 9.  Defendant responds that it has not been afforded sufficient discovery to either admit or deny this assertion.

[3] Defendant's Response to Plaintiff's Statement of Material Facts (Dkt. No. 22-1) ("DRSMF") ¶ 9. Defendant contends that Williams entered into the Riders under economic duress and that the Riders are unenforceable under the Telecommunications Act.  "DRSMF" ¶¶ 10-11.  These arguments are addressed below.

interest in the Network.  Id. ¶ 14.  In 2006, Defendant stopped making payments, but continued to use the Network and the access provided under the Riders.  Id. ¶ 17.

In July 2009, NYSTA demanded payment of $2,070,266.36, which it claimed was owed under the Riders.  PSMF ¶ 18.  NYSTA further advised that if payment was not forthcoming within thirty days, it would commence legal action.  Id. ¶ 19.  Defendant did not make any additional payments to NYSTA, and filed a Petition for a Declaratory Ruling with the Federal Communications Commission on July 23, 2009.  Id. ¶ 20.

On October 14, 2009, NYSTA commenced a collection action in New York state court seeking payment and interest and the matter was removed to this Court.  Id. ¶ 21; Dkt. No. 1 ("Notice of removal").  NYSTA's initial Complaint sought damages for breach of contract as well as collection fees of twenty-two percent pursuant to Section 18 of the New York State Finance Law.  Dkt. No. 1-1. On March 3, 2010, NYSTA submitted an Amended Complaint that included both its original causes of action and also sought damages for anticipatory breach and a declaratory judgment that: (1) NYSTA "has satisfied its obligations under the Agreements and that the Agreements are valid and enforceable"; (2) Defendant "is not excused from making payments under the Agreements"; and (3) Defendant "is estopped from asserting the enforceability of the Agreements based upon the grounds asserted in this litigation."  Dkt. No. 8 ¶¶ 21-54.  Following a conference with the parties, the Honorable Randolph F. Treece, United States Magistrate Judge, entered an Order staying discovery pending resolution of the present Motion.  Dkt. No. 20.

### III.    STANDARD OF REVIEW

Rule 56 instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

3

Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).  Further, "[w]here a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense–on which the defendant bears the burden of proof at trial," Fed. Deposit Ins. Corp. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994), that plaintiff must show "that there is an absence of evidence to support [an essential element of] the [non-moving party's] case." DiCola v. SwissRe Holding (N. Am.), Inc., 996 F.2d 30, 32 (2d Cir. 1993) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (alterations in original).

If the moving party has shown that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 323. This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986). At the same time, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).  The Court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

To sustain a breach of contract claim, NYSTA must demonstrate: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages

suffered as a result of the breach. First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998). NYSTA has alleged a *prima facie* breach of contract claim: (1) a contract exists because the Agreement and Riders were signed by Williams and acquired by Defendant; (2) NYSTA performed the contract by providing the additional access points to Defendant; (3) Defendant has discontinued making any payments pursuant to the Riders; and (4) NYSTA has not realized the monies to which it is entitled under the terms of the Riders. However, Defendant asserts the following affirmative defenses: (1) there was no mutual assent because its predecessor Williams acted under economic duress; and (2) the Riders are void because they violate federal law. Defendant's Memorandum of law in opposition to summary judgment (Dkt. No. 22) ("Def.'s Mem.") at 5-22.[4] The Court addresses each of these contentions in turn.

### A. Duress

"The doctrine of economic duress is grounded in the principle that courts 'will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury.'" VKK Corp. v. NFL, 244 F.3d 114, 122 (2d Cir. 2001) (internal quotation marks omitted). The burden of establishing a duress defense is a heavy one. Regent Partners, Inc. v. Parr Dev. Co., Inc., 960 F. Supp. 607, 612 (E.D.N.Y. 1997) (citing Halliwell

---

[4] NYSTA claims that Defendant's affirmative defenses are time-barred by the applicable statute of limitations. Plaintiff's Reply memorandum of law in support of motion for summary judgment (Dkt. No. 23) ("Pl.'s Reply Mem.") at 3-4. Under New York law, a defense is timely if it was timely at the time the complaint was filed. N.Y. C.P.L.R. § 203(d). Here, NYSTA commenced the instant action seeking to recover damages against Defendant. Defendant is seeking to assert duress and preemption as defenses, which arise from and directly relate to NYSTA's claim of breach of contract. Accordingly, the statute of limitations does not bar the assertion of such a defense. See Bloomfield v. Bloomfield, 97 N.Y.2d 188, 193 (N.Y. 2001) ("It is axiomatic that claims and defenses that arise out of the same transaction as a claim asserted in the complaint are not barred by the Statute of Limitations, even though an independent action by defendant might have been time-barred at the time the action was commenced.").

Mines, Ltd. v. Cont'l Copper & Steel Indus., Inc., 544 F.2d 105, 108 (2d Cir. 1976)). "To void a contract on the ground of economic duress, the complaining party must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will." Interpharm, Inc. v. Wells Fargo Bank, N.A., 655 F.3d 136, 142 (2d Cir. 2011). "The existence of economic duress is demonstrated by proof that one party to a contract . . . threatened to breach the agreement by withholding performance unless the other party agree[d] to some further demand." 805 Third Ave. Co. v. M.W. Realty Assoc., 461 N.Y.2d 447, 451 (N.Y. 1983).

Defendant claims that the first element of its duress defense is satisfied because NYSTA and Adesta both threatened "to deny Williams' contractual right to additional interconnection/access points to the Backbone Network unless Williams agreed to NYSTA's demands for further compensation." Def.'s Mem. at 19. According to Defendant, the second element is also met because, without these additional access points, Williams' original investment in the Network would have been rendered useless and Williams therefore had no choice but to execute the Riders. Id.

The original Agreement between Adesta and Williams provided Williams with:

the right to have the User Route modified to allow connection at additional access points . . . which additional points shall be subject to the approval of [Adesta] (which approval shall be given unless [Adesta] reasonably determines that such access (i) is prohibited by [Adesta's] agreements with underlying property owners ([Adesta] shall use commercially reasonable efforts to obtain permission from the New York State Thruway Authority for [Williams] to have the same access points along the User Route as [Adesta]), or (ii) may adversely affect the operation of other fibers or the operation of the Communications System) and provided USER reimburses [Adesta] for [Adesta's] actual, direct costs incurred in performing such modifications.

Agreement at 2. Under the plain terms of the Agreement, then, Williams was not unconditionally entitled to the installation and use of additional access points. Rather, Williams' ability to acquire additional access points depended upon certain contingencies, including Adesta's obtaining the

6

necessary approvals from NYSTA and Williams' paying for the costs incurred in connection with establishing additional access points.  See id.  Further, NYSTA had no contractual obligation under the original Agreement to consent to the additional access points.  See 805 Third Ave., 58 N.Y.2d at 453 (finding plaintiff's claim of duress proper where "the contract does not establish that defendant had an absolute duty to perform").  To the contrary, the Agreement implicitly recognized that NYSTA could deny such permission.  Further, neither Adesta nor NYSTA ever withheld access to the Network conditioned on Williams' acceptance of NYSTA's payment terms for the new access points.  Therefore, the Court does not find here any wrongful threat sufficient for Defendant to claim economic duress as an affirmative defense.

Nor is there sufficient evidence to establish that Williams was precluded from exercising its free will, the second essential element of a breach of contract claim.  "A defense of duress cannot be sustained by a contracting party who has simply been bested in contract negotiations by the 'hard bargaining' of another contractive party . . . even when the hard bargainer knowingly takes advantage of his counterpart's difficult financial circumstances."  Regent Partners, Inc., 960 F. Supp. at 612.  First, Williams was represented by counsel in negotiating the Riders.  See id. (where the party seeking to make out a duress defense had access to competent and knowledgeable counsel, "it is still more difficult to 'demonstrate the element of compulsion necessary to a finding of duress'") (quoting First Nat'l Bank of Cincinnati v. Pepper, 454 F.2d 626, 634 (2d Cir. 1972)).  Further, Defendant does not explain why an available legal remedy for breach of contract was not adequate to redress any threatened coercion, or why its predecessor did not promptly seek legal redress.  See Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 130-31 (N.Y. 1971) (holding that in order to successfully establish a defense of duress, "[i]t must also appear that the threatened party could not obtain the goods from

another source of supply *and* that the ordinary remedy of an action for breach of contract would not be adequate.") (emphasis added); Adrian Family Partners I, L.P. v. Exxonmobil Corp., 886 N.Y.S.2d 69 (N.Y. Sup. Ct. 2007).  Williams was aware of the terms of the Riders it executed, and any economic duress (i.e., a claimed threat to deny access to the Network) was removed once the Riders were signed. See Kovian v. Fulton County Nat'l Bank & Tr. Co., 857 F. Supp. 1032, 1040 (N.D.N.Y. 1994).  At that time, Williams was given permission to construct and use the additional access points it needed. Indeed, since that time, Williams (and now Defendant) has continuously used those access points, and there is insufficient evidence in the record to suggest that Adesta or NYSTA have ever threatened to discontinue Williams' access to the Network or the additional access points.

Finally, even assuming economic duress was present, the record demonstrates that Defendant's predecessors ratified the Riders.  Williams and its successor, WilTel, made payments pursuant to the Riders for six years and never sought to avoid doing so, even during bankruptcy proceedings.  That Williams and WilTel reaped the benefits of the Riders for such a long period of time constitutes sufficient evidence of an intent to ratify the Riders, thereby precluding a defense of economic duress as a matter of law.  See King, 418 F.3d at 132-33 (in a "typical contract case, . . . eight years of acquiescence in the agreement with full knowledge of its terms . . . would be enough under New York law to show that [a party] ratified the agreement") (citing Benjamin Goldstein Prods., Ltd., 198 A.D.2d at 138 (holding that a knowing acceptance of benefits from a contract for over a year after the agreement was executed constitutes ratification); Sheindlin, 88 A.D.2d at 931); Colburn Family Found., 739 F. Supp. 2d at 621.  Accordingly, Defendant is estopped from asserting an economic duress defense.

**B.  Preemption**

Next, the Court considers whether the Riders are preempted by federal law.  Section 253(a) of the Telecommunications Act provides that "[n]o State . . .  may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a).[5]  NYSTA argues that § 253(a) is not applicable because: (1) it is not subject to § 253(a) because it is neither a state nor a municipality, or, alternatively, because it was acting as a "market participant"; (2) § 253(a) only applies "where the alleged preclusive effect relates to third parties"; (3) § 253(a) does not authorize a private cause of action and therefore may not be used as a defense to avoid payment under the Riders; and (4) Defendant has reaped the benefits of the Riders and is therefore estopped from asserting a defense under § 253(a).  Pl.'s Mem. at 6-15.  The Court addresses each of these arguments below.

### 1.  Applicability of § 253(a) to NYSTA

---

[5]  Section 253 also has a "safe harbor" provision, which reads as follows:

"Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."  47 U.S.C. § 253(c).

This provision authorizes state and local governments "to regulate telecommunication services on public property and to collect compensation for its use, if certain parameters are observed."  Global Network Commc'ns, Inc. v. City of New York, 562 A.D.3d 145, 151 (2d Cir. 2009).  Here, Plaintiff argues only that it cannot be deemed to have acted as "the state" under § 253(a) and that the statute does not authorize a private cause of action; thus the Court does not address at this juncture whether the Riders do operate as an unlawful prohibition of telecommunications services, or whether the Riders would fall under the safe harbor provision of § 253(c).  See Tel Comm Tech. v. City of New Haven, No. 3:03CV1895, 2006 WL 2348544, at *6 (D. Conn. Aug. 10, 2006) (citing TC Sys., Inc. v. Town of Colonie, N.Y., 263 F. Supp. 2d 471, 484 (N.D.N.Y. 2003)) (initial inquiry is whether § 253(a) "acts as a prohibition before determining whether the regulation is saved by Section 253(c).").

NYSTA contends that it is not subject to § 253 because: (1) it is an independent, autonomous entity that is not an agent of the state or any other governmental entity; or, alternatively, (2) it was acting as a market participant.  The first of these arguments must be rejected out of hand, as the New York Court of Appeals has held that NYSTA as "an arm or agency of the state" with a close relationship to the State.  Easley v. N.Y. State Thruway Auth., 1 N.Y.2d 374, 376 (N.Y. 1956).  Viewed in conjunction with other cases that have found similarly semi-autonomous or quasi-governmental entities subject to the Telecommunications Act, the Court concludes that NYSTA's actions fall within the scope of § 253.[6]  See Qwest Corp. v. Elephant Butte Irrigation Dist., 616 F. Supp. 2d 1110 (D.N.M. 2008); WCI Cable, Inc. v. Alaska Railroad Corp., 274 B.R. 529 (D. Or. 2002).

NYSTA next argues that its actions were not that of a state or local government, but of a "market participant" because it negotiated with Williams as any owner of private property would.  Pl.'s Mem. at 8.  Defendant disputes this characterization on the grounds that it "sought state-required authority to enter and occupy specific highway rights-of-way from NYSTA . . . pursuant to a state-law permitting regime implemented by NYSTA."  Def.'s Mem. at 10.

"Not all actions by state or local government entities . . . constitute regulation, for [a state or local government] . . ., like a private person, may buy and sell or own and manage property in the

---

[6]     The Second Circuit case on which Plaintiff relies, Mancuso v. N.Y. State Thruway Auth., 86 F.3d 289 (2d Cir. 1996), is not to the contrary.  In Mancuso, the court found that NYSTA was not an "arm of the state" for purposes of Eleventh Amendment immunity, but was required to weigh a number of other factors relevant to an Eleventh Amendment analysis in reaching that conclusion.  See id. at 293-97.  However, the Second Circuit considered that New York state court decisions, in particular Easley, actually supported a finding of Eleventh Amendment immunity, but that a number of other considerations warranted finding that NYSTA was not entitled to immunity as an arm of the state.  Id.  For this and the reasons given above, Mancuso does not compel a finding that NYSTA is not a state agent for purposes of the Telecommunications Act.

10

marketplace." Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 417 (2d Cir. 2002); see also Bldg. &

Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of

Massachusetts/Rhode Island, Inc., 507 U.S. 218, 227 (1993).  Accordingly, "the Telecommunications

Act does not preempt nonregulatory decisions of a local government entity or instrumentality acting in

its proprietary capacity."  Sprint Spectrum, 283 F.3d at 421.  Considerations of whether state action is

"proprietary" include whether: (1) the state action "reflects the governmental entity's own interest in its

efficient procurement of needed goods and services, as measured by comparison with the typical

behavior of private parties in similar circumstances"; and (2) "the narrow scope of the challenged

action defeats an inference that its primary goal was to encourage a general policy rather than address a

specific proprietary problem."  Id. at 420 (quoting Cardinal Towing & Auto Repair, Inc. v. City of

Bedford, 180 F.3d 686, 693 (5th Cir. 1999)) (internal quotations and alterations omitted).

        The Court finds that NYSTA has not sustained its burden of establishing an absence of

evidence that it was acting in a regulatory, rather than proprietary, capacity.  On the one hand, there are

facts suggesting that NYSTA may have been acting as a market participant in leasing to Williams the

property it managed.  For instance, when Williams needed additional access points, it negotiated

additional property rights from NYSTA.  It at least appears from the Agreement that similar property

rights would have had to be negotiated from private property owners.  See Agreement at 3.  As the

Second Circuit considered in Sprint, so the Court considers here that there appears to be no reason why

NYSTA, like a private property owner, would not have the authority to deny all telecommunications

providers access to the Network, or to charge those providers for such access.  See id. (finding

proprietary action based, in part, upon the fact that, like a private party, the school district would have

the right to refuse to enter into a contract with a telecommunications provider).

11

However, Defendant has also introduced sufficient facts to support an inference that NYSTA's "are not of a purely proprietary nature, but rather, were taken pursuant to regulatory objectives or policy" – namely, NYSTA's statutory mandate to lease or grant permits for the right to construct various communications equipment along the New York State Thruway.  N.Y. PUB. AUTH. Law § 354(11); see also N.Y. HIGH. LAW § 52 (requiring telecommunications companies to obtain permits before "erect[ing] or construct[ing] any fixtures" within the state highway right of way); Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 93 (2d Cir. 2009) (rejecting an argument by NYSTA that it acted as a market participant for purposes of the Commerce Clause because "the statute creating [NYSTA] provides that [NYSTA] '*shall be regarded as performing a governmental function* in carrying out its corporate purpose and in exercising the powers granted by this title.'") (quoting N.Y. PUB. AUTH. LAW § 353) (emphasis in original).  Such laws tend to support an inference that NYSTA was acting in a regulatory rather than a proprietary capacity when it executed the Riders.

It is true that the mere existence of state statutes and guidelines relating to the permitting process does not compel a finding that a state was acting in a regulatory capacity.  See Sprint Spectrum, 283 F.3d at 408.  Nonetheless, there are insufficient facts before the Court at this time either to compare NYSTA's actions with the typical behavior of private parties in similar circumstances, or to ascertain the extent of competition in leasing land for the installation of fiber optic networks.  See Coastal Commc'ns Serv., Inc. v. City of N.Y., 658 F. Supp. 2d 425, 446 (E.D.N.Y. 2009) (noting the distinction between a contract whereby the state is "merely acquiring fiber optic capacity for its own use" and therefore acting permissibly under § 253(a), versus "granting its contract partner exclusive access to freeway rights-of-way," which would be impermissible) (citing Amigo.Net, 17 FCC Rcd. 10964, 10967 (2002)).  That NYSTA contends that no other telecommunications providers sought to

12

expand the network, but Defendant claims that it has not been afforded sufficient discovery to either admit or deny this assertion, also supports the conclusion that further factual discovery on this issue is appropriate.

Finally, the Court considers that there are issues of fact as to whether the scope of the Riders defeats an inference that their primary goal was to encourage a general policy rather than address a specific proprietary problem.  Although one particular contract is at issue here, see Sprint, 283 F.3d at 420, the overall scope of the leasing scheme at issue in this case "cannot readily be described as 'narrow'" where access to multiple points along a fiber optic network spanning 550 miles is at issue. NextG Networks of N.Y., Inc. v. City of N.Y., No. 03 Civ. 9672, 2004 WL 2884308, at *5 n.9 (S.D.N.Y. Dec. 10, 2004) (citing Van-Go Transp. Co. v. N.Y. City Bd. of Educ., 53 F. Supp. 2d 278, 288 (E.D.N.Y. 1999) (finding city school board's actions regulatory and not proprietary because "the policy at issue extended beyond the parties to a single contract")).  Further factual discovery as to NYSTA's process of granting telecommunications companies access to the Thruway may lead to a conclusion that, as a matter of law, that process (which includes the Riders at issue) implicates regulatory policies rather than proprietary needs.  See Selevan v. N.Y. Thruway Auth., 584 F.3d at 93 (finding that for purposes of the Commerce Clause NYSTA was not acting as a market participant with respect to setting toll rates because "[a]lthough there is undoubtedly a market comprised of private entities competing with one another for government contracts, we see no evidence in the record that [NYSTA] competes with other entities that are also seeking to build and maintain highway systems."); Petrosky v. N.Y. State Dep't of Motor Vehicles, 971 F. Supp. 75, 77 (N.D.N.Y. 1997) ("Because summary judgment is a drastic device, it should not be granted where parties have yet to exercise their

13

opportunity for pre-trial discovery."). Accordingly, Plaintiff's Motion for summary judgment on this basis is denied.

### 2. Applicability of § 253 to a Bargained-For Exchange Between Two Parties

Plaintiff next argues that § 253 "is only applicable where the alleged preclusive effect relates to third parties – it does not apply to a bargained for exchange between two contracting parties." Pl.'s Mem. of Law at 8. Plaintiff's proposed interpretation, however, contradicts the plain language of the statute, which applies to a "local statute or regulation, or other State or local legal requirement . . . [that] prohibit[s] or [has] the effect of prohibiting the ability of **any** entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a) (emphasis added); see also Negusie v. Holder, 555 U.S. 511, 542 (2009) ("[A]ll statutory interpretation questions . . . must begin with the plain language of the statute.") (citations omitted); Luyando v. Grinker, 8 F.3d 948, 950 (2d Cir. 1993). Nor does it comport with the relatively broad reading that both other courts and the Federal Communications Commission have both accorded § 253(a). See Time Warner Telecom of Oregon, LLC v. City of Portland, 452 F. Supp. 2d 1084, 1096-97 (D. Or. 2006) (finding that a private carrier could challenge franchise agreement with city under § 253(a) because "[o]therwise, a local government might try to shield an onerous restriction from challenge by placing the restriction in the franchise agreement rather than imposing it through a regulation"), rev'd in part on other grounds, 322 F. App'x at 496 (9th Cir. 2009); In re Amigo.Net, 17 F.C.C. Rcd. at 10967 ("[A] state could impose, as part of a contract to obtain telecommunications services, the type of legal requirement proscribed by section 253.") (citing Minnesota Preemption Order, 14 F.C.C. Rcd. 21697 (1999)).

Moreover, the interpretation of § 253(a) that Plaintiff urges conflicts with § 253(c), which exempts state management of public rights-of-way provided it is done in a "competitively neutral and

14

nondiscriminatory basis."  A contract with a telecommunications provider that did not contain

competitively neutral terms and/or was otherwise had discriminatory terms (e.g., contained terms more

onerous than the terms offered to other providers) would not fall within the purview of the safe harbor

and could constitute a violation of § 253(a).  Because it is a "familiar rule" of statutory construction

"that, where possible, provisions of a statute should be read so as not to create a conflict," Louisiana

Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n, 476 U.S. 355, 370 (1986), the Court finds that

Plaintiff is not entitled to summary judgment in its favor on the basis of this argument.

### 3.  Whether § 253 Provides a Private Cause of Action

NYSTA further argues that § 253 may not be used as an affirmative defense to the breach of

contract claim because the statute does not provide for a private right of action for damages.  Pl.'s

Reply Mem. at 5.  This argument, too, must be rejected.  Although the Second Circuit has made clear

that § 253 does not create a private right of action for damages, NextG Networks of N.Y., Inc. v. City

of N.Y., 513 F.3d 49, 52-55 (2d Cir. 2008), that holding does not apply where, as here, Defendant

asserts preemption as an affirmative defense against NYSTA's attempt to enforce the Riders.  See City

of Rome, N.Y. v. Verizon Commc'ns, Inc. 362 F.3d 168, 182 (2d Cir. 2004) (dismissing for lack of

subject matter jurisdiction because federal question not sufficiently present where "the role that Section

253 has played in this action is primarily that of a defense against the [plaintiff's] attempt to exercise

its rights under state and local law, and its efforts to impose a new franchise agreement upon

[defendant]"); Western Air Lines, Inc. v. Port Auth. of N.Y. and N.J., 817 F.2d 222, 225-26 (2d Cir.

1987) (affirming district court finding that plaintiff could bring preemption challenge under the Airline

Deregulation Act even if the statute lacked a private right of action to enforce the statute).[7]  Plaintiff's

Motion for summary judgment on this ground is therefore denied.

> *4.  Whether Defendant Should Be Estopped From Asserting § 253 as a Defense*

NYSTA's final argument is that, having accepted the benefit of the Riders, Defendant

should be estopped from challenging their validity under § 253(a).  Pl.'s Mem. at 12-15.  However,

contractual estoppel may not be used to enforce a contract that is illegal or against public policy.  <u>See</u>

<u>In re Rhinelander's Will</u>, 264 A.D. 607, 611 (N.Y. App. Div. 1942), <u>rev'd on other grounds</u>, 290 N.Y.

31 (1943) ("An illegal contract may not be made legal by estoppel"); <u>see also</u> <u>In re International Match</u>

<u>Corp.</u>, 190 F.2d 458, 467 (2d Cir. 1951) (citations and quotations omitted) ("[I]f public policy prohibit

such a bargain in advance, it would seem that a court should be astute not to give effect to such illegal

contract by indirection, as by spelling out a waiver or estoppel. . . ."); <u>Sprint Spectrum L.P. v. Willoth</u>,

996 F. Supp. 253, 256 (W.D.N.Y. 1998) ("[T]he Federal Telecommunications Act of 1996 . . . has

been characterized as an unusually important legislative enactment  establishing national public policy

in favor of reducing regulation and encouraging the rapid deployment of new telecommunications

technologies.") (internal quotations and citation omitted).

The Court notes that this issue is closely tied to whether preemption applies in the first

place.  If the riders were prohibited by § 253, Plaintiff may not properly raise estoppel; however, if

---

[7]  Moreover, under NYSTA's theory, a state or local government could avoid running afoul of § 253(a) by simply inserting terms into a contract that would otherwise violate § 253(a).  <u>See</u> <u>Time Warner Telecom of Oregon, LLC v. City of Portland</u>, 452 F. Supp. 2d at 1096-97.  It would make little sense to preclude Defendant from asserting § 253(a) as a defense to the validity of the Riders in this action when it could obtain identical relief through a declaratory judgment action.  <u>See</u> <u>NextG Networks</u>, 513 F.3d at 53 n.4; <u>Western Airlines</u>, 817 F.2d at 225-26; <u>City of Portland, Or. v. Electric Lightwave, Inc.</u>, 452 F. Supp. 2d 1049 (D. Or. 2005).

preemption does not apply, the riders are not illegal and estoppel may be raised.  Because the Court, at

this time, denies NYSTA's motion for summary judgment on the preemption issue, NYSTA's motion

on the basis that Defendant should be estopped from asserting § 253 as a defense is also denied.

**V.**        **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Motion for summary judgment (Dkt. No. 21) is **GRANTED in**

**part and DENIED in part**, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

DATED:  March 30, 2012
        Albany, New York

_____
        Lawrence E. Kahn
        U.S. District Judge

17